## 11099

### HAESLOOP v. CITY COUNCIL OF CHARLESTON

(115 S. E., 596)

1. MUNICIPAL CORPORATIONS—LAND GRANTED BY STATE TO CITY OF
   CHARLESTON IN FEE SIMPLE, BEFORE ADOPTION OF CONSTITUTION OF
   1895, HELD NOT SUBJECT TO RESTRICTIONS ON ALIENATION.—Land
   granted by the state under Act Aug. 13, 1873 (7 St. at Large, p.
   97), to the city of Charleston in fee simple and in proprietary right,
   does not come under the provisions of Const. 1895, Art. 3, § 31,
   providing that lands belonging to or under the control of the State
   shall never be donated to private corporations or individuals; the
   land not having been granted for governmental purposes.

2. MUNICIPAL CORPORATIONS—MUNICIPALITY MAY EXERCISE POWERS
   EXPRESSLY GRANTED BY LEGISLATIVE AUTHORITY.—A municipal cor-
   poration possesses and may freely exercise the powers granted in
   express words by competent legislative authority.

3. MUNICIPAL CORPORATIONS—PROPERTY HELD FOR GOVERNMENTAL PUR-
   POSES ALIENABLE ONLY UNDER LEGISLATIVE AUTHORITY, AND, IF HELD
   FOR GENERAL PURPOSES, SALE IS DISCRETIONARY.—All property held
   by municipal corporations is held in a fiduciary capacity, and prop-
   erty held for strictly governmental purposes or which has been
   devoted to a special public use may be sold or disposed of only

under express legislative authority; but property acquired and held for general municipal purposes is subject to the municipality's discretionary power of use and disposal, but such discretionary power does not include the authority to donate municipal property to a strictly private use; for a transfer or release of such property by a municipality to a private ownership without receiving in return some consideration would amount to a palpable breach of trust upon which it is held.

4. MUNICIPAL CORPORATIONS—EQUITY WILL NOT RESTRAIN EXERCISE OF DISCRETIONARY POWERS IN DISPOSING OF MUNICIPAL PROPERTY, IN ABSENCE OF FRAUD, ILLEGALITY, OR ABUSE OF AUTHORITY.—Equity will not interfere at the suit of a taxpayer to restrain the authorities of a municipality in the exercise of their discretionary powers with regard to the control or disposition of property of the municipality, in absence of illegality, fraud, or clear abuse of authority.

5. MUNICIPAL CORPORATIONS—TEST STATED FOR DETERMINING VALIDITY OF MUNICIPAL AUTHORITIES IN DISPOSING OF MUNICIPAL PROPERTY UNDER TERMS OF GRANT FROM STATE.—The measure of the fiduciary obligation of a city council in disposing of land being prescribed by the grant in the words "conducive to the welfare and advantage of the said city and the inhabitants thereof," the test of the validity of the disposition of the propery is the standard of diligence and prudence that men of ordinary prudence and intelligence in such matters employ in their own like affairs, and the elements of benefit to the city the council are entitled to take into consideration in managing and disposing of this property are essentially the same as if they were trustees under a will.

6. MUNICIPAL CORPORATIONS—IN ASCERTAINING WHAT IS PUBLIC PURPOSE, BENEFITS OF INCREASED TAX VALUE AND IMPETUS TO COMMERCIAL LIFE OF COMMUNITY ORDINARILY TOO INCIDENTAL TO JUSTIFY EXPENDITURE OF PUBLIC FUNDS.—In ascertaining what is a public purpose within the power to tax, such benefits from a proposed expenditure as will accrue from increased taxable values, from enhancement of property values generally, and from increased impetus to the commercial life of the community will ordinarily be considered too incidental to justify an outlay of public funds.

7. MUNICIPAL CORPORATIONS—MUNICIPALITY HELD TO HAVE No POWER TO ENTER INTO CONTRACTS INVOLVING TAXATION WHERE PURPOSE NOT PUBLIC.—Municipal corporations have no power to enter into contracts of any kind that involve for their fulfillment the dangerous power of taxation where the subject to be subserved is not essentially public in its nature.

8. MUNICIPAL CORPORATIONS—CONVEYANCE BY CITY COUNCIL OF MUNICIPAL PROPERTY TO PRIVATE PERSONS FOR ERECTION OF HOTEL HELD NOT INVALID; "DONATION OF STATE LANDS TO PRIVATE PARTY;"

"Public Purpose."—A grant by the city council of Charleston on condition that the grantee erect within ten months a million dollar tourist hotel on the land according to plans and specifications, of vacant unproductive real estate granted to the city by the State under Act August 13, 1873 (7 St. at Large, p. 97), and held in a proprietary or quasi private capacity under broad powers expressly conferring the right of discretionary disposal for the welfare and advantage of the city, *held* not in violation of Const. 1895, Art. 3, § 31, prohibiting donations of State lands to private parties, but is one for public purpose authorized in the city's charter, and supported by a contractual consideration in the form of substantial returns on tax revenues, and benefit to the city and its inhabitants.

In the original jurisdiction. November, 1922. Suit by F. J. Haesloop for an injunction to restrain the City Council of Charleston from conveying municipal property. Complaint dismissed.

*Mr. John J. Cosgrove, Corporation Counsel,* for defendant, cites: *Hotel is a quasi-public service utility:* 6 L. R. A. (N. S.), 851. *Taxation to build a railroad sustained:* 9 S. E., 662. *Municipality may own land in its governmental and its private capacity:* 19 R. C. L., 750. *What is alienation:* 199 Fed., 811; 24 N. H., 550; 3 N. Y., Sup. 574.

*Messrs. Hagood, Rivers & Young,* for plaintiff.

January 11, 1923.

The opinion of the Court was delivered by MR. JUSTICE MARION.

Action by a citizen and taxpayer of Charleston in the original jurisdiction of this Court to enjoin the City Council of Charleston from conveying upon certain terms a lot of land for use as a site for the erection of a tourist hotel in said city.

The cause was heard upon the verified pleadings, which raise the one question of whether the City Council of Charleston can lawfully convey certain real estate owned

by said city pursuant to the terms of the following resolution of council, duly adopted October 10, 1922:

"Whereas, G. L. Miller & Co., Inc., of Atlanta, Ga., have addressed a letter, dated October 3, 1922, to Hon. John P. Grace, mayor, which letter has been read and filed at this meeting of council, in which the said G. L. Miller & Co., Inc., have undertaken to finance the construction of a new hotel on a parcel of land now owned by the city, bounded on the east by King Street extended, on the south by the Boulevard, and on the west by the property of Lawton and Williams, provided the city will convey this property to Mr. Edward J. Murphy, or a company which he may form, said conveyance to be free and clear without any reservation; and,

"Whereas, it has long been desired that this property be used for hotel purposes so that the public generally might have the use of and enjoy the benefits of this magnificent site unequaled anywhere for such a purpose; and,

"Whereas, great and inestimable benefits will accrue to the City of Charleston by the donation of this site to a use which will bring strangers from all over the world to our doors:

"Resolved, that the mayor be, and he is hereby, authorized, empowered, and instructed to convey to Edward J. Murphy, or a company which he may form, all that lot of land now owned by the City of Charleston, situated at the foot of King Street extended, 'bounded on the north by South Bay Street, on the east by King Street extended, on the south by the Boulevard, and on the west by the property of Lawton and Williams,' in trust, nevertheless, for the following purposes and uses:

"That the said Edward J. Murphy, or a company which he may form, shall hold the said property for the construction, beginning within approximately 30 days of the signing of this deed, and completed within approximately 10 months from the starting of the work of building a modern

tourist hotel, fireproof, and in every respect equal to the hotel plans for which were drawn by Messrs. G. Lloyd Preacher & Co., architects, of Atlanta, and filed with city council at this meeting, said plans, however, to be perfected in detail and made final by Messrs. G. Lloyd Preacher & Co., architects, of Atlanta, immediately upon the passage of this resolution; otherwise such conveyance to the said Edward J. Murphy, or a company which he may form, to be null and void, and said property to revert to the City of Charleston in fee simple, freed and discharged of all further trusts."

To the answer, setting out certain facts upon which the defendant relies to sustain the validity of the proposed conveyance, the plaintiff interposed an oral demurrer. The allegations of the answer thus admitted as to the matters of fact therein embraced are substantially as follows:

(1) That the charter of the City of Charleston, adopted in 1783, provides: ·

"Sec. 4. That the said intendant shall and may, as often as occasion shall require, summon the wardens to meet together in city council, any nine of whom to be a quorum, who, with the intendant, shall be known by the name of, and they are hereby declared to be, the City Council of Charleston; and they and their successors, hereafter to be appointed, shall have a common seal and shall be capable in law to purchase, have, hold, receive, enjoy, possess and retain, to them and their successors, for the use of the City of Charleston in perpetuity or for any term of years, any estate or estates, real or personal * * * and to sell, alien, exchange or lease the same or any part thereof as they shall think proper. ·

"Sec. 5. * * * Any vacant low-water lots fronting any of the streets, shall be vested in said city council and their successors, for the use and advantage of the said city, to be leased, sold, improved on or otherwise disposed of, as to the said city council shall appear most conducive to

the welfare and advantage of the said city, and the inhabitants thereof."

(2) That the lot of land proposed to be conveyed was formerly a low-water lot which was reclaimed several years ago, and which has since lain idle and has been of no material use to the city or its citizens either for pleasure or profit; that it has never produced any revenue and has never been in any way dedicated to or used for a public purpose; and that it has never been considered a portion of the public lands of the defendant used for the enjoyment or profit of its citizens, "but is owned and controlled by defendant exclusively in its private or proprietary capacity as opposed to its governmental capacity as a municipal corporation."

(3) That the proposed conveyance is for a public purpose, to wit, the erection of a hotel, which is a quasi public institution of the nature of a public utility, established and maintained for the service of the public, required by law to furnish, within reasonable limitations, accommodation to the public generally, and subject to regulation by both the municipal and the state governments.

(4) That the proposed conveyance is not an unqualified donation, but is for a valuable consideration, in that it is conditioned upon the discharge by the grantee of the obligation to erect within approximately 10 months a modern fireproof tourist hotel, in accordance with prescribed plans and specifications, involving the expenditure of about $1,000,000, whereby the City of Charleston, rich in historical interest and climatic advantages, will be provided with a suitable hostelry, now lacking, to accommodate the. tourist travel annually visiting the South for recreation and pleasure; that thereby a recognized public need of the community will be fulfilled to the material benefit and financial advantage of the city and of its inhabitants; and that thereby, in any event, approximately $1,000,000 will be added to the taxable values of the city from which there will be

an annual financial return in additional taxes to the city, county, and state inuring to the benefit of the plaintiff and all other taxpayers of the state and constituting an adequate consideration of direct financial value to the city sufficient to support the proposed grant.

1. It is contended by the plaintiff that the contemplated action of the city council is prohibited, directly or impliedly, by the terms of Section 31, Art. 3 of the State Constitution of 1895, providing that "lands belonging to or under the control of the state shall never be donated, directly or indirectly, to private corporations or individuals, or to railroad companies," etc. Admittedly the state's fee-simple title in and to the real estate here in question was granted to and vested in the City Council of Charleston by an act of August 13, 1873 (7 Stat., 97), adopted by the duly constituted legislative body of the state. It has not been suggested that there were any such rights of navigation or of piscary, or other public rights, involved in the disposal of these low-water lots as would in any wise limit the state's absolute power of alienation. The Legislature would seem to have been fully clothed with power to convey, as was done, the fee-simple title in this land to the City Council of Charleston. If so it is apparent that the real estate here involved is not, and was not at the time of the adoption of the Constitution of 1895, "lands belonging to or under the control of the state" within either the letter or the reasonable intendment of the language there employed. While all lands within the state's borders are at all times in a sense "under the control of the state" in its governmental capacity—that is, subject to regulation and appropriation in the legitimate exercise of its powers of police and of eminent domain—manifestly, we think, the reference in this constitutional provision is to public lands belonging to and controlled by the state in its capacity as sovereign proprietor. Had the land here involved been granted by the state to an individual, and

subsequently conveyed to the city council, it would scarcely
be contended that at the time of the adoption of the Con-,
stitution of 1895 it was land "belonging to or under the
control of the state." Obviously, in the aspect of the
matter here involved, the fact that the fee in the land was
granted directly to the City Council of Charleston can
make no difference. At the time of the subsequent adop-
tion of the Constitution, the state having divested itself of
title by a valid legislative grant, this real estate could no
more properly be characterized or claimed as "lands be-
longing to or under the control of the state" than any other
land held by private owners, as all such lands are held, un-
der original grant from the state.

Nor do we think there is controlling force in the sugges-
tion that, by virtue of the municipal character of the grantee
and of the state's reserved control over the charters of
municipal corporations, the lands of such public corpora-
tions, held in a proprietary capacity, fall by necessary
implication within the constitutional designation of "lands
* * * under the control of the state." As was said by
this Court, speaking through Mr. Justice McIver, in Re
Malone's Estate, 21 S. C., 435, 448:

"While it is true that the state retains absolute control
over charters which it may grant to municipal corpora-
tions, and may, at any time, alter or modify or even repeal
them altogether, yet it by no means follows that it retains
the same control over all the property of such a corporation."

In that case it was held that a grant by the state to the
City Council of Charleston in 1799 of all escheated prop-
erty within certain territorial limits and to limited amount,
for the benefit of its orphan house, could not be annulled,
or the rights conferred divested by Section 11, Art. 10,
of the Constitution of 1868, providing that the proceeds
of all escheated lands should be invested in and preserved
as a state school fund. That conclusion was reached, after
a review of the authorities, in accordance with the princi-

ples authoritatively settled by the Dartmouth College Case,
4 Wheat., 518, 4 L. Ed., 629, *Fletcher v. Peck,* 6 Cranch.
87, 3 L. Ed., 162, and other cases cited by the distinguished
jurist to the effect that a state may not "recall its own
endowments granted to any hospital, or college, or city, or
town, for the use of such corporations." Story, J., in Dart-
mouth College Case. That a grant of property "by the
state to a municipal corporation for a purpose not govern-
mental is, like a grant to a private corporation or an
individual, an executed contract which may not be impaired
by a subsequent statute" or constitutional ordinance, is not
open to serious question. 12 C. J., 1005; *Powlet v. Clark,*
9 Cranch, 292, 3 L. Ed., 735; *Grogan v. San Francisco,*
18 Cal., 590; *Richland County v. Lawrence County,* 12
Ill., 1, 8; *People v. Hand,* 158 App. Div., 510, 135 N. Y.
Supp., 192, 143 N. Y. Supp., 1138. It is admitted by
the demurrer that the land here in controversy is held by
the city in its proprietary, and not in its governmental,
capacity. That admission is not contrary to the terms of
the grant (charter [Sections 4 and 5, 7 Stat., 97]), which
vest the said low-water lots "in the city council and
their successors for the use and advantage of the said city,"
not to be devoted to any special public use or governmental
purpose therein designated, but "to be leased, sold, improved
on, or otherwise disposed of, as to the said city council shall
appear most conducive to the welfare and advantage of the
said city and the inhabitants thereof." Since the land here
in controversy was not, because of its ownership by a
municipal corporation, "under the control of the state" in
any sense that would permit of the revocation or impair-
ment of the original grant by the state, it would seem clear
that no presumption or implication is to be indulged that it
was intended to be embraced within the limitation imposed
by Section 31, Art. 3, of the Constitution, substantially
restricting the power of alienation of the lands therein
designated. See 19 R. C. L., pp., 759, 760, § 64; 1 Dillon,

Munic. Crop. (4th Ed.), pp. 72, 107, 108; Judge Cooley in *People ex rel. Leroy v. Hurlbut,* 24 Mich., 44, 9 Am. Rep., 103.

That view is reinforced by this additional consideration: Conceding that the state in the exercise of its police power might by valid constitutional ordinance have prohibited a municipal corporation from donating property not held for governmental purposes to a private individual or corporation, no such regulation is either expressly or impliedly imposed by the provisions of Article 8 of the Constitution of 1895, which expressly deals with the subject of "Municipal Corporations and Police Regulations."

We conclude, therefore, that the proposed grant of the real estate in controversy to a private individual or corporation by the City Council of Charleston as resolved is not prohibited by the provisions of Sec. 31, Art. 3, of the Constitution of 1895.

2. But it is further contended, as we understand, that, even in the absence of any constitutional inhibition, the contemplated action of the city council would be *ultra vires* and void in that it is a donation of public property to a private use. Since it is a general and undisputed proposition of law that a municipal corporation possesses and may freely exercise the powers "granted in express words" by competent legislative authority (1 Dillon on Municipal Corporations, § 89; *Luther v. Wheeler,* 73 S. C., 83, 52 S. E., 874, 4 L. R. A. (N. S.), 746, 6 Ann. Cas., 754), our first concern is to determine the nature and limits of the powers so conferred upon the City Council of Charleston with respect to the ownership, control, and disposition of the real estate here involved. Those powers are clearly and definitely granted, in language that leaves nothing to implication, in Sections 4 and 5 of the charter (7 Stat., 97) the pertinent provisions of which have been set out above. The city council are thereby vested with the general power to receive, hold, and enjoy real es-

tate for the use of the city and "to sell, alien, exchange or lease the same, or any part thereof, as they shall think proper." The fee simple of the low-water lots, of which this real estate is admitted to be a part, is "vested in the said city council, and their successors, for the use and advantage of the said city to be leased, sold, improved on, or otherwise disposed of as to the said city council shall appear most conducive to the welfare and advantage of the said city," etc. It is apparent that by the terms of said grant the state, through the Legislature, the duly constituted organ of the sovereign power, not only vested in the city council the state's proprietary right in and dominion over this land, the *jus privatum* of the crown at common law, but also released the right that the state itself possessed, the *jus publicum* vested in parliament at common law, to use and dispose of it in the public interest, unto the city council for the benefit of the City of Charleston. *People v. Kirk,* 162 Ill., 138, 45 N. E., 830, 53 Am. St. Rep., 277. That is, it was a grant of the fee, with unlimited power of disposal, in trust for the benefit of the public of the municipality of Charleston. The concrete question, therefore, is whether the contemplated grant of this lot to a private individual or corporation in consideration of the erection thereon of the proposed tourist hotel would be an *ultra vires* act, amounting to such a repudiation or violation of this trust as would invalidate the grant.

Certain general principles of law applicable to the solution of the question may be thus stated. In the sense that all powers of municipal corporations are held in trust for public use, all property held by such corporations is held in a fiduciary capacity. 28 Cyc., 621. Property held by such corporation for strictly governmental purposes or which has been devoted to a special public use may be sold or disposed of only under express legislative authority; but property acquired and held for general municipal purposes is subject to the corporation's discre-

tionary power of use and disposal. 28 Cyc., 622. It is universally conceded, however, that such discretionary power of use and disposal does not include the authority to donate municipal property to a strictly private use, for the obvious reason that a transfer or release of such property by a municipality to a private ownership without receiving in return some consideration of reasonably equivalent value would amount to a palpable breach of the trust upon which it is held. 28 Cyc., 625.

But it is an equally well settled principle that a Court of equity will not attempt to control the discretionary powers conferred on trustees, or, more specifically, will not interfere at the suit of a taxpayer to restrain the authorities of a municipal corporation in the exercise of their discretionary powers with regard to the control or disposition of property of the municipality, in the absence of illegality, fraud, or clear abuse of their authority. 28 A. & E. Ency. of Law, 991; 28 Cyc., 1744. Our only legitimate inquiry, therefore, takes the form of whether the proposed conveyance of real estate by the City Council of Charleston is such a donation of public property to a private use as manifestly amounts to a breach of the trust imposed to use and dispose of the said property, in a way "conducive to the welfare and advantage of the said city and its inhabitants."

The right of the city council, under the powers conferred to sell this land to a private person or corporation for a private use for its market value in money, or to lease it to a private person or corporation for a private use for its rental value in money, or to exchange it for other property of equivalent value in money, is unquestionable, and, as we understand, is not disputed. The plaintiff bases his suit for injunctive relief largely upon the ground that the property could be sold for a cash consideration, and the proceeds devoted to purposes for which money must otherwise be raised by taxation. The right to lease municipal

property, even where acquired for and devoted to a public or governmental purpose, when the property can no longer be used for such necessary public purpose, has frequently been upheld by the Courts. 20 A. & E. Ency. (2d Ed.), 1187; *Bryant v. Logan,* 56 W. Va., 141, 49 S. E., 21, 3 Ann. Cas., 1011 (lease of part of a public park); *Gushee v. New York,* 26 Misc. Rep., 287, 56 N. Y. Supp., 1002; Id., 42 App. Div., 37, 58 N. Y. Supp., 967 (lease of a hotel on park property to a private person); *Jones v. Camden,* 44 S. C., 319, 23 S. E., 141, 51 Am. St. Rep., 819. Since the city council has the right to sell or lease for money, under the broad powers to "exchange," to "alien," and "otherwise dispose of" this land we think there can be no doubt of their right to dispose of it for money's worth. If, therefore, the city council has the right to dispose of this property for money's worth—that is, for a consideration of reasonably equivalent value in money—the next step in the inquiry is to determine the elements of value, with particular reference to direct and indirect benefits, the council is entitled to consider in weighing and establishing the equivalent of a monetary consideration.

The measure of the council's fiduciary obligation is clearly and definitely prescribed by the grant in the words "conducive to the welfare and advantage of the said city and the inhabitants thereof." In the discharge of that trust the legal test of validity to be applied to the council's action, as we apprehend, differs in no essential particular from the standard applicable under the law of trusts to a like exercise of discretion by the trustee of a private estate, vested with discretionary authority to manage and dispose of property for the advantage or best interests of the estate. Broadly, it is the standard of diligence and purdence that men of ordinary purdence and intelligence in such matters employ in their own like affairs. 26 R. C. L., p. 1306. Thus it has been held that the donation of trust funds to aid in building a hotel, when this is

necessary to secure its location near real property belonging to the trust estate, the value of which will be enhanced thereby, is within the power of such a trustee. *Drake v. Crane*, 127 Mo., 85, 29 S. W.; 990, 27 L. R. A., 653, 26 R. C. L., p. 1306. It follows that the elements of benefit to the city the council are entitled to take into consideration in managing and disposing of this property are essentially the same as if they were trustees appointed under a will to hold and dispose of real property therein devised for the welfare and advantage of the City of Charleston. See *McIntosh v. Charleston*, 45 S. C., 584, 23 S. E., 943. Hence, in determining what constitutes a consideration adequately equivalent in value to sustain a disposition of this property, we think it is clear that the city council are not limited to those elements of value that accrue, or are presumed to accrue, to a municipality from the appropriation of funds or property to such a "public use" or "public purpose" as would justify the exercise of the governmental powers of taxation or of eminent domain.

For reasons of sound public policy, unreservedly approved by this Court, it has been uniformly held in this and in other jurisdictions that municipal corporations have no power to enter into contracts of any kind that involve for their fulfilment the exercise of the dangerous power of taxation where the object to be subserved is not essentially "public" in its nature. It is true that what is a "public purpose" in this sense is a question as complex as the social life of the modern urban community. For illustrative views of our own Court as to what will constitute a public purpose within the meaning of the right to tax, see *Feldman v. City Council of Charleston*, 23 S. C., 57, 55 Am. Rep., 6 (denying the right to issue bonds to assist private individuals in rebuilding after a fire) ; *State ex rel. James Copes v. Mayor, etc., of Charleston*, 10 Rich. 491 (upholding the right to subscribe to a railroad outside the state) ; *State v. Whitesides*, 30 S. C., 579, 9

S. E., 661, 3 L. R. A. 777, and *State v. Neely,* 30 S. C., 587, 9 S. E., 664, 3 L. R. A. 672 (railroads) ; *Allen v. Adams,* 66 S. C., 344, 44 S. E., 938 (schoolhouse not to be used or controlled by the municipal authorities, a public or corporate purpose).

In ascertaining what is a public purpose within the power to tax, such benefits from a proposed expenditure as will accrue from increased taxable values, from enhancement of property values generally, and from increased impetus to the commercial life of the community will ordinarily be considered of too incidental or secondary a character to justify an outlay of public funds. *Feldman v. Charleston, supra; Citizens' Sav., etc., Ass'n v. Topeka,* 20 Wall., 655, 22 L. Ed., 455. It therefore becomes of importance to observe that benefits of the character indicated are not only clearly within the purview of the express powers granted in this matter, but that the reason for the limitation of the term "public use," so as not to include such benefits where the power of taxation is involved, a reason based upon the danger of the abuse of that "power to destroy," is absent in the case at bar. The property here in question was neither purchased with money raised by taxation, nor does its proposed disposal involve a resort to the power of taxation. Whether its sale for money and the conversion of the proceeds to other corporate purposes would, in point of fact, lighten the plaintiff's burden of taxation in the slightest is entirely conjectural. The money might legitimately be invested in some other form of property equally unproductive of monetary returns or equally devoid of present public use. In any view, for the purpose of the present inquiry, it not only does not appear that the disposal of this property would entail any exercise of the power of taxation, directly or indirectly, to the injury of the plaintiff, but the allegation of the answer admitted by the demurrer is to the effect that the result would be to lighten the tax burden by increasing the municipal

revenue from taxation, to the material benefit of the plain-
tiff and all other taxpayers.  In the light of the foregoing
considerations, is the contemplated action of the city council
to be deemed a donation of public property to a private use,
and therefore *ultra vires* and void?

In no sense that would impeach the validity of the
councils action do we think the proposed grant can be
pronounced a donation to a private use or for a pri-
vate purpose.   It is not a donation in the prohibited sense of
being a gift, a gratuitous bestowal or appropriation, a
grant without any consideration.   Here the consideration
inuring to the corporation is definitely imposed by the
conditions requiring (1) erection upon a vacant, unproduc-
tive lot, (2) within 10 months, (3) of a tourist hotel, (4)
in accordance with prescribed plans and specifications, (5)
at a cost of approximately $1,000,000.   If in lieu of ac-
cepting in cash the market value of the property, to be
turned into the public treasury and applied to current
municipal expenses or invested in other property or lent at
interest, the city elects to receive the financial benefit of a
permanent real estate improvement, which would reason-
ably tend to enhance the value of other municipal property,
and from which it will derive by due operation of law an
annual return in taxes upon an additional $1,000,000 of
taxable property, can it be said that such consideration is
of less value to the city even from a purely financial stand-
point, than the consideration in cash suggested?   Or let
us suppose that the council had seen fit to lease this prop-
erty at an adequate rental for a private use, as it had the
right to do.   Admittedly it is unimproved, unproductive
real estate, and there is nothing in the record to indicate
that it could have been, or that it could ever be, leased for
an annual rental that would nearly approach in amount of
dollars and cents the annual return in taxes upon $1,000,000
of taxable property.   The point may be illustrated by the
application of a few simple figures.   An assessment of

such property at 25 per cent. of its cost price, or at $250,-000, at a municipal tax rate of 20 mills to the dollar, which is less than the average municipal tax rate of the state, would bring into the city treasury annually the sum of $5,000, the equivalent of 6 per cent. interest upon about $83,000. It would seem indisputable that, if the question now before the Court were the validity of the council's action in selling this property for a cash sum much less than $83,000, or in leasing it for a rental far below $5,000 per annum, in the absence of a showing of fraud, there would be not the slightest ground for interference. To hold that, because such a consideration of direct financial value to the city is not in the form of a fixed monetary payment, a grant supported thereby is a donation to a private use, would, we think, be an unreasonable insistence upon form at the expense of substance. In the case of *Roberts v. Northern Pacific Railroad Co.,* 158 U. S., 1, 18, 30, 15 Sup. Ct., 761, 39 L. Ed., at page 879, involving in principle this identical point, the Supreme Court of the United States said:

"In the first place, the transaction between the County of Douglas and the Northern Pacific Railroad Company did not involve the exercise of the taxing power of the county. The county did not issue bonds, or seek to subject itself to any obligation to raise money by taxation. The case, as already stated, was that of a sale. The county authorities had ample powers to sell and convey such of its lands as were not used or dedicated to municipal purposes. * * * It is, indeed, urged that the county authorities could only sell its lands for money. We do not accede to this proposition. If they possessed the power to sell for money, we are pointed to no express provision of law that restricts them from selling for money's worth. Even upon such a narrow view, it may well be contended that the consideration received by the county included a money payment. The deed recites the payment of money by the company

to the county at the time of the conveyance, and it is a conceded fact that the lands since they came into the possession of the company have yielded considerable sums as taxes to the county. It is straining no principle of law or of good sense to regard the payment of an annual tax as equivalent, for the purpose of our present inquiry, to the payment of a rent. The amount, as well as the nature of the consideration received by the county exchange for its lands, if it had the power to sell them, was a matter that concerned the county only."

To the element of value just considered are to be added the other advantages to "the city and its inhabitants," which the council were entitled to evaluate in this connection, such as the benefit of needed facilities for caring for tourist travel, the quickening of the commercial life of the community reasonably to be anticipated from such a hotel as a channel of trade and commerce, and the distinctly public character of the service rendered by such a utility. In the view here taken, as we have indicated, it is not necessary to decide that a hotel is a public utility within the meaning of the right to tax or to invoke the power of eminent domain. But there can be no doubt that the extent to which such an enterprise partakes of the nature of a public utility has a legitimate and important bearing upon the value the council might reasonably assign to the erection of a building of that character. Whether the test of "public use" be the right of the public under the law to use and regulate the particular utility or the relation of the utility to the public good and advantage, the difficulty of distinguishing a hotel from other enterprises which have been held to subserve a public use or a public purpose has been recognized by Courts and text-writers. As was said by the Court in *Dayton Mining Co. v. Seawell,* 11 Nev., 394, 411:

"The public have the same right, upon payment of a fixed compensation, to seek rest and refreshment at a public inn as they have to travel upon a railroad."

See *Clemons v. Meadows,* 123 Ky., 178, 94 S. W., 13, 6 L. R. A. (N. S.), 851, 124 Am. St. Rep., 339. And as is pointed out by the author of Lewis on Eminent Domain (3d Ed.), Vol. 1, § 258, p. 511:

"But certainly a hotel is also for the public benefit and advantage as well as a railroad, and is as much within one construction of the words 'public use' as the other."

For our purposes, it is only necessary to observe that there are marked and well-recognized characteristics of a hotel as a public utility which the city council might properly appraise as an element of direct value to the city in disposing of this property upon the terms agreed. Since, therefore, the proposed grant of this real estate, held in a proprietary or quasi private capacity, under broad powers expressly conferring the right of discretionary disposal for the welfare and advantage of the city, is supported by a contractual consideration that reasonably secures to the city substantial returns in tax revenues and in other benefits having a clearly disclosed relation to the public good, we are of the opinion that it is not such a donation of public property to a private use in manifest abuse of the council's discretionary powers as will invalidate the conveyance authorized by the resolution of council.

It is accordingly ordered and adjudged that the motion for injunction be refused, and that the complaint be dismissed.

Dismissed.